UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

JUSTIN GILBERT,                    )
                                   )
            Plaintiff,             )
                                   )
v.                                 )    No.:   2:22-CV-108-TAV-CRW
                                   )
CITY OF NEWPORT,                   )
                                   )
            Defendant.             )

## <u>MEMORANDUM OPINION</u>

This matter is before the Court on defendant's motion for summary judgment [Doc. 31] and plaintiff's motion for partial summary judgment [Doc. 34]. The parties have responded [Docs. 47, 51] and replied [Docs. 52, 53] to each motion. Accordingly, this matter is ripe for review. *See* E.D. Tenn. L. R. 7.1(a). For the reasons that follow, defendant's motion for summary judgment [Doc. 31] will be **GRANTED**, plaintiff's motion for partial summary judgment [Doc. 34] will be **DENIED**, and this case will be **DISMISSED**.

## I.    Background[1]

This action arises from the circumstances surrounding plaintiff's resignation from the Newport Fire Department ("NFD") on September 17, 2021 [*see* Doc. 1]. Justin Gilbert

---

[1] The Court derives these facts from the parties' exhibits [Docs. 31-1–31-8, 37–42, 46-1–46-6], drawing upon the parties' statement of undisputed material facts [Doc. 46] wherever possible. Because plaintiff is the nonmovant with respect to all claims except the FMLA claim, the Court describes the facts in the light most favorable to him. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when assessing the parties' cross-motions as to the FMLA claim, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *McKay v. Federspiel*, 823 F.3d 862, 866 (6th Cir. 2016).

was hired by the City of Newport, a Tennessee municipality, in September 2002 as a firefighter with the NFD [Doc. 37, pp. 13, 16; Doc. 15, p. 2]. He was promoted twice during his tenure with NFD: first to Engineer, then to Captain on March 22, 2013 [Doc. 37, pp. 24–25]. During his employment with NFD, plaintiff received at least a satisfactory or acceptable rating on every performance evaluation [Doc. 41, pp. 45–97]. Although he regularly consumed alcohol throughout this period, his consumption increased to a point of excess by 2014 and eventually impacted his job performance [Doc. 37, p. 78]. Plaintiff believes that his alcohol dependency developed following stressful emergency medical calls to which he began responding after NFD initiated a new program in 2013 [*Id*. at 83–84].

Plaintiff sought treatment for his alcohol dependency in late 2019, including visits to a new primary care physician and the Helen Ross McNabb mobile clinic for addiction services [*Id*. at 87–89]. He was prescribed the injectable medication Vivitrol to curb his cravings for alcohol; however, he was forced to discontinue the medication due to his health insurance denying coverage for the expensive pharmaceutical [*Id*. at 89–91]. Throughout this period, defendant was unaware of plaintiff's dependency on alcohol or the treatment he sought [Doc. 31-4, 56–58].

In December 2020, plaintiff responded to an emergency motor vehicle accident that tragically involved multiple deaths [Doc. 37, pp. 150–51]. In the months following this incident, plaintiff began drinking alcohol even more heavily to cope with his emotional trauma [*Id*.]. Plaintiff's wife testified that plaintiff's alcohol use was out of control by June 2021 [Doc. 31-7, p. 44].

2

On June 11, 2021, plaintiff removed items belonging to Eric Herndon, an NFD battalion chief and coworker, from a workplace locker and placed them on the tailboard of a fire truck [Doc. 41, p. 114; Doc. 31-4, p. 15]. In a subsequent written reprimand about the incident, Jeremy Shelton, NFD Fire Chief, stated that "[i]nstead of investigating the situation and talking to Eric to get it worked out, [plaintiff] took matters into [his] own hands and created animosity in the firehall" [Doc. 41, p. 114]. Afterwards, plaintiff disclosed his alcohol dependency to defendant for the first time during a meeting with Shelton and Missy Masoner, City of Newport Human Resources Director [Doc. 37, pp. 157, 162]. However, plaintiff did not disclose his post-traumatic stress disorder ("PTSD") diagnosis to Shelton or Masoner, nor did he disclose this at any time prior to his resignation [Doc. 40, p. 188; Doc. 42-1, pp. 110–11]. At the meeting, plaintiff requested and received Family and Medical Leave Act ("FMLA") leave from the NFD to seek treatment at an inpatient rehabilitation program in Sevierville, Tennessee [*Id.* at 52, 60–63]. The next day, Shelton exchanged text messages regarding this incident with Herndon [Doc. 38, pp. 10, 58–59]. Herndon texted "I'm over [plaintiff] you can't do anything for him or with him it's always somebody's [*sic*] else's fault he see's [*sic*] nothing wrong with what he does" [*Id.* at 160]. In response, Shelton said he was "about done as well" [*Id.*].

Plaintiff was later allowed to return to work without restriction following his discharge from the rehabilitation program, but he relapsed into alcohol dependency by September 2021 [Doc. 31-8, p. 42; Doc. 37, p. 169]. On September 21, 2021, NFD received a call for a structure fire [*Id.* at 163]. While experiencing alcohol withdrawal symptoms,

3

plaintiff discovered the fire truck pulling out of the station by the time he arrived for duty [Doc. 37, pp. 182–85]. He drove a secondary truck to the scene of the fire where he confronted a coworker, using aggressive and demeaning language [*Id.* at 187–88; Doc. 40, p. 164]. Upon returning to the NFD station, plaintiff called Masoner and indicated that he had been drinking again, though the parties dispute the exact substance of this phone call [*Id.* at 194–95, 199; *see* Doc. 46 ¶ 42]. That said, the parties agree that plaintiff disclosed his relapse to Masoner and Shelton [Doc. 40, pp. 168–69]. Masoner and Shelton came to the station to meet with plaintiff that day and agreed to follow up with him on September 14, 2021 [Doc. 40, pp. 169, 181–82].

The next day, plaintiff sustained a cervical fracture while attempting suicide, resulting in his hospitalization [Doc. 37, pp. 205–06].[2] On September 14, 2021, while still recovering from his injuries, plaintiff met with and provided a written statement to Masoner, Shelton, and Josh Gerber, plaintiff's counselor [*Id.* at 191–92]. At the meeting, plaintiff requested leave to attend an inpatient rehabilitation center as he had before that summer [Doc. 40, pp. 182, 188–89]. The parties agree that the potential of plaintiff's attending inpatient rehabilitation for 3 to 12 months was discussed at this meeting; however, they dispute whether defendant represented to plaintiff that he was eligible for "any kind of leave" [Doc. 42-1, pp. 84–85; *see* Doc. 46 ¶¶ 58–60]. It is undisputed that plaintiff was

---

[2] Defendant disputes the materiality of these facts [*see* Doc. 46 ¶¶ 50–53]. In light of the Court's duty to construe facts in the light most favorable to the nonmoving party with respect to all claims except the FMLA claim, s*ee Matsushita Elec.*, 475 U.S. at 587, the Court includes this background, which is relevant to plaintiff's actions following September 13, 2021.

4

employed by defendant for 12 months in which he worked at least 1,250 hours prior to this request, as required by the FMLA [Doc. 42, pp. 87–88; *see* Doc. 46 ¶¶ 75–76].

On September 16, 2021, Shelton requested that plaintiff meet with him alone at Newport City Hall [Doc. 37, pp. 211–12].  Plaintiff agreed and received a letter notifying him that Shelton was recommending his termination to the City's Board of Mayor and Alderman [*Id.*; Doc. 40, p. 191].  He was placed on suspension without pay pending an internal investigation and NFD's recommendation of his termination [Doc. 41, p. 131]. Plaintiff wished to consider resigning in lieu of termination because it was his understanding that the Board of Mayor and Alderman meetings were open to the public, recorded, and placed on the City's website, thereby exposing him to public scrutiny [Doc. 37, p. 211].  In particular, he feared public discussion of his alcohol dependency, though defendant disputes that such discussion would have ever occurred given that plaintiff's termination letter did not cite alcohol dependency as a basis for his termination [*Id.*; *see* Doc. 46 ¶ 68].  Ultimately, plaintiff tendered his letter of resignation to defendant and began inpatient detoxification the following day on September 18, 2021 [Doc. 46-4, p. 74].  He commenced the instant action on September 12, 2022 [Doc. 1].

## II.    Standard of Review

Summary judgment under Federal Rule of Civil Procedure 56 is proper only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of establishing that no genuine issues of material fact exist.  *Celotex*

5

*Corp. v. Catrett*, 477 U.S. 317, 330 n.2 (1986); *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339 (6th Cir. 1993). Furthermore, all facts and inferences that the Court draws from the record before it must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burchett v. Kiefer*, 301 F.3d 937, 942 (6th Cir. 2002).

Yet, "[o]nce the moving party presents evidence sufficient to support a motion under Rule 56, the nonmoving party is not entitled to a trial merely on the basis of allegations." *Curtis Through Curtis v. Universal Match Corp.*, 778 F. Supp. 1421, 1423 (E.D. Tenn. 1991) (citing *Celotex*, 477 U.S. at 317). To establish a genuine issue as to the existence of a particular element, the nonmoving party must point to evidence in the record upon which a reasonable finder of fact could find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.*

The court's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper question for the factfinder. *Id.* at 250. The court does not weigh the evidence or determine the truth of the matter. *Id.* at 249. Nor does the court search the record "to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989). Thus, "the inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual

6

issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

## III.    Analysis

### a.  Discrimination under the Americans with Disabilities Act

Plaintiff argues that he was terminated from his employment because of his disabilities, including alcoholism and PTSD, in violation of the Americans with Disabilities Act ("ADA") [Doc. 51, p. 9].  Additionally, he claims that defendant failed to reasonably accommodate those disabilities [*Id*. at 24].  While plaintiff concedes for purposes of summary judgment that he has not adduced direct evidence of discrimination, he argues that indirect evidence presents a genuine dispute of material fact as to defendant's discriminatory behavior [Doc. 51, p. 6].

Defendant argues that neither of plaintiff's claims under the ADA has merit [Doc. 48, p. 15].  While it concedes certain elements of plaintiff's prima facie case of discrimination, defendant argues that plaintiff did not suffer an adverse employment action [*Id*. at 17].  Even if plaintiff has established a prima facie case, defendant cites plaintiff's misconduct while on duty as a nondiscriminatory justification for his termination, regardless of plaintiff's disabilities [*Id*.].  Finally, defendant argues that this basis for termination is not pretextual, and plaintiff has failed to adduce evidence showing that it is [*Id*. at 20].

The ADA provides that it is unlawful for certain "covered" employers to "discriminate against a qualified individual on the basis of a disability" which includes the failure to make reasonable accommodations to disabled employees.   42 U.S.C.

7

§ 12112(b)(5)(A).  An employer is also required to engage in an "interactive process" with an employee requesting a reasonable accommodation due to a disability "to 'identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.'"  *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 871 (6th Cir. 2007) (quoting 29 C.F.R. § 1630.2(o)(3)).  The Court will address each of plaintiff's two ADA claims in turn.

### 1. Whether Plaintiff Establishes a Prima Facie Case of ADA Discrimination

To discern whether a party establishes a prima facie case of employment discrimination through indirect evidence under the ADA, courts apply the *McDonnell Douglas*[3] burden-shifting framework.  *See Hrdlicka v. Gen. Motors, LLC*, 63 F.4th 555, 566 (6th Cir. 2023).  Under this framework, a plaintiff must show that: (1) he is disabled; (2) otherwise qualified for the position, with or without reasonable accommodation; (3) suffered an adverse employment decision; (4) the employer knew or had reason to know of the plaintiff's disability; and (5) the position remained open while the employer sought other applicants or the disabled individual was replaced.  *Hart v. HCFS Health Care Fin. Serv., LLC*, No. 3:20-CV-155, 2022 WL 865883, at *5 (E.D. Tenn. Mar. 22, 2022) (quoting *Whitfield v. Tennessee*, 639 F.3d 253, 258–59 (6th Cir. 2011), *abrogated on other grounds in Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312 (6th Cir. 2012)).  If the plaintiff succeeds in establishing a prima facie case, the burden shifts to the defendant to

---

[3]  411 U.S. 792, 802–04 (1973).

"demonstrate that there was a legitimate, nondiscriminatory reason for the adverse employment action." *Hrdlicka*, 63 F.4th at 567 (quoting *Whitfield*, 639 F.3d at 259).

If the defendant carries its burden of production, then "plaintiff must then prove 'by a preponderance of the evidence' that the defendant's proffered reasons were not its true reasons, but were merely a pretext for illegal discrimination." *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 883 (6th Cir. 1996) (quoting *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, (1981)). "More specifically, a plaintiff must produce enough evidence that a jury could reasonably reject the employer's explanation for its decisions." *Id.* (citing *Manzer v. Diamond Shamrock Chems. Co*., 29 F.3d 1078, 1083 (6th Cir. 1994), *overruled on other grounds by Gross v. FBL Fin. Servs., Inc*., 557 U.S. 167, 180 (2009)). *Kocsis* described three methods through which a plaintiff could rebut a defendant's proffered justification: "(1) that the proffered reasons had no basis in fact; (2) that the proffered reasons did not actually motivate the action; or (3) that they were insufficient to motivate the action." 97 F.3d at 883.

Here, the parties appear to agree that plaintiff has established all but one of five required elements of his prima facie discrimination case [*see* Doc. 48, p. 17; Doc. 51, p. 9]. That is, plaintiff's alcoholism and PTSD qualify as disabilities, he was otherwise qualified for his position at NFD, defendant knew or had reason to know of at least one of plaintiff's disabilities, and the position remained open while the employer sought other applicants. *See Hart*, 2022 WL 865883, at \*5; s*ee also Blazek v. City of Lakewood*, 576 F. App'x 512, 516 (6th Cir. 2014) (holding that alcoholism constitutes a disability under the ADA); *Arndt v.*

9

*Ford Motor Co.*, 716 F. App'x 519, 520 (6th Cir. 2017) (holding that PTSD constitutes a disability under the ADA). So, the only disputed prima facie element for purposes of summary judgment is whether plaintiff suffered an adverse employment decision.

## A. Whether Plaintiff "Suffered an Adverse Employment Decision"

Plaintiff argues that defendant's suspension of him without pay and recommendation for his termination constitute "intolerable working conditions," amounting to constructive discharge [Doc. 36, p. 13]. He contends that his decision to resign in lieu of termination was a foreseeable consequence of defendant's actions [*Id.* at 14]. He further alleges that the City's recommendation of his termination created a situation in which he could not realistically defend himself given the public nature of City Board of Mayor and Alderman meetings where he believed he would be forced to disclose private information about his alcoholism and PTSD [*Id.*].

Defendant argues that plaintiff has failed to produce any evidence that an adverse employment decision was made on the basis of his disabilities because he voluntarily resigned [Doc. 48, p. 15]. Although Shelton prepared a recommendation to terminate plaintiff's employment, only the City's Board of Mayor and Alderman possessed the legal authority to terminate plaintiff [*Id.* at 16]. Additionally, defendant rejects plaintiff's invocation of constructive discharge because Shelton lacked decision making power [*Id.*].

In defining "adverse employment decision," the United States Supreme Court has held that suspension without pay can constitute an "adverse" decision in the related context of Title VII discrimination actions. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S.

10

53, 72–73 (2006).[4] However, in *Burlington*, the Court focused on several case-specific facts that could cause "[a] reasonable employee facing the choice between retaining her job (and paycheck) and filing a discrimination complaint [to] choose the former," including a 37-day suspension, physical and emotional hardship stemming from the loss of income, and the plaintiff's need for medical treatment stemming from emotional distress. *Id*. at 73.

Alternatively, to show constructive discharge under the ADA, a plaintiff must show that "working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Talley v. Fam. Dollar Stores of Ohio, Inc*., 542 F.3d 1099, 1107 (6th Cir. 2008) (quoting *Held v. Gulf Oil Co*., 684 F.2d 427, 432 (6th Cir. 1982)) (citations omitted). Specifically, "a plaintiff must prove: (1) the employer deliberately created working conditions that a reasonable person would perceive as intolerable, (2) the employer did so to force the employee to quit, and (3) the employee quit." *Cooper v. Dolgencorp, LLC*, 93 F.4th 360, 373 (6th Cir. 2024) (citing *Savage v. Gee*, 665 F.3d 732, 739 (6th Cir. 2012)). Evaluating this argument at summary judgment, the United States Court of Appeals for the Sixth Circuit held that "a jury may conclude that the employee's resignation was both intended and foreseeable" "when an employee makes a repeated request for an accommodation and that request is both denied and no other reasonable alternative is offered." *Id*. at 1109.

---

[4] The Court notes that plaintiff cites the Sixth Circuit's opinion in *Burlington* prior to its appeal before the Supreme Court [Doc. 51, p. 10]. While the Supreme Court ultimately affirmed, its analysis of "adverse employment decision" differs somewhat; therefore, the Court references the controlling opinion on this question.

11

The Court assumes without deciding that sufficient evidence exists on the record to support a genuine dispute of material fact as to whether plaintiff suffered an adverse employment decision. Although his ten-day suspension is significantly shorter than the 37-day period analyzed in *Burlington*, plaintiff could plausibly argue that the suspension caused him financial or emotional hardship sufficient to categorize this as an "adverse" decision. *See* 548 U.S. at 72. Alternatively, plaintiff could plausibly persuade the finder of fact to infer constructive discharge given that the conditions surrounding Shelton's termination letter and the scheduled hearing before the Board of Mayor and Alderman "compelled [plaintiff] to resign."[5] *Talley*, 542 F.3d at 1099. These inferences are particularly apt given that the Court must make all reasonable inferences in favor of the non-moving party on summary judgment, and in this case plaintiff has only counter-moved for summary judgment as to the FMLA claims. *See Matsushita Elec.*, 475 U.S. at 587.

Although defendant cites *Laster v. City of Kalamazoo*, 746 F.3d 714, 729 (6th Cir. 2014) (affirming dismissal of Title VII discrimination claim due in part to plaintiff's failure to establish constructive discharge) in support of its argument that Shelton's lack of final decision-making power forecloses plaintiff's constructive discharge argument, this case is distinguishable. The *Laster* plaintiff was subjected to an inconclusive internal investigation regarding alleged misconduct and ultimately required to attend a "pre-determination hearing" where administrators would decide on his termination. *Id.* at 724–25. The Sixth

---

[5] The Court acknowledges plaintiff's "cat's paw" theory, *see, e.g.*, *Marshall v. The Rawlings Co. LLC*, 854 F.3d 368, 378 (6th Cir. 2017), concerning Shelton's role in the decision making process; however, having found a dispute of material fact as to an adverse employment decision, it is unnecessary to address the merits of this theory.

12

Circuit noted that the fact the plaintiff "was not directly told that he would be terminated at the pre-determination hearing" distinguished his case from situations in which "a [p]laintiff quits in order to avoid being fired." *Id*. at 728–29. Here, Shelton's recommendation of plaintiff's termination was far more decisive than the "pre-determination hearing" in *Laster* ahead of which an administrator told the plaintiff he "did not have any input in the disciplinary action" and "did not know what disciplinary action, if any, the administrators overseeing the pre-determination hearing were planning to take." *Id*. at 724. By contrast, Shelton's letter effectively put plaintiff on notice that his termination was all but certain, albeit rendered by a separate actor.

In sum, assuming without deciding that a genuine dispute of fact exists as to whether plaintiff suffered an adverse employment action, the Court will proceed under the *McDonnell Douglas* burden-shifting framework to determine whether a similar dispute exists as to defendant's "demonstrat[ion] that there was a legitimate, nondiscriminatory reason for the adverse employment decision." *Hrdlicka*, 63 F.4th at 566.

### 2. Whether a Dispute Exists as to Defendant's Nondiscriminatory Basis for Plaintiff's Termination

Even if plaintiff's prima facie case withstands summary judgment, defendant contends that it had a legitimate non-discriminatory reason for the action it took, namely that plaintiff's misconduct disqualified him from his job [Doc. 48, p. 19]. Defendant argues that there was "ample basis" to terminate plaintiff's employment based on his assault of a fellow firefighter and pattern of difficult behavior in the firehouse [*Id*. at 20]. Plaintiff

13

appears to concede that this nondiscriminatory reason "had a basis in fact" and "could motivate dismissal" [Doc. 51, p. 7 n.2–3].

After carefully reviewing the parties' evidence, the Court finds that while plaintiff has established a prima facie case of discriminatory termination in violation of the ADA, no reasonable jury could find that defendant lacked "a legitimate, nondiscriminatory reason for the adverse employment action." *Hrdlicka*, 63 F.4th at 567 (quoting *Whitfield*, 639 F.3d at 259). Multiple instances of misconduct leading to written reprimands unquestionably provide an employer with a legitimate basis for adverse employment action, which plaintiff does not appear to dispute in this case [*see* Doc. 51, p. 7 n.2–3]. Accordingly, the Court moves on to the third and final step of the *McDonnell Douglas* burden-shifting framework.

### 3. Whether a Dispute Exists as to Plaintiff's Allegation that Defendant's Basis for Plaintiff's Termination was Pretextual

Plaintiff contends that suspicious timing in this case suggests a pretextual motive as NFD was "looking for a reason to terminate [plaintiff's] employment since the day after [he] initially admitted that he suffered from alcohol dependency" [Doc. 51, p. 15]. Specifically, he points to the timing of text messages between Herndon and Shelton that expressed frustration with plaintiff prior to his first admission of alcohol dependency [*Id*. at 15–16]. Defendant argues that plaintiff's misconduct motivated, including his assault of a fellow firefighter and pattern of difficult behavior in the firehouse, was the sole motivation behind his termination recommendation [Doc. 48, p. 20].

"In order to establish pretext, a plaintiff will usually need to show 'that the employer's stated reason for the adverse employment action either (1) has no basis in fact,

14

(2) was not the actual reason, or (3) is insufficient to explain the employer's action.'" *Yarberry v. Gregg Appliances, Inc.*, 625 F. App'x 729, 741 (6th Cir. 2015) (quoting *Risch v. Royal Oak Police Dept.*, 581 F.3d 383, 391 (6th Cir. 2009)). "A plaintiff 'may also demonstrate pretext by offering evidence which challenges the reasonableness of the employer's decision to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation.'" *Id.*

After carefully reviewing the parties' evidence, the Court finds that while plaintiff has established a prima facie case of discriminatory termination in violation of the ADA, no reasonable jury could find that defendant's cited basis for plaintiff's termination was pretextual. As an initial matter, plaintiff never disclosed his PTSD diagnosis to defendant at any time prior to his resignation; thus, the evidence does not support any inference that defendant's recommendation for plaintiff's termination was a pretext for PTSD discrimination. As for alcoholism, the Sixth Circuit has repeatedly held that conduct stemming from an employee's alcoholism may provide an employer with a legitimate basis for firing an employee without violating the ADA. *Stanciel v. Donahoe*, 570 F. App'x 578, 582 (6th Cir. 2014) (affirming summary judgment in defendant's favor where plaintiff asserted alcoholism discrimination claim but accumulated attendance violations); *Blazek*, 576 F. App'x at 513 (affirming summary judgment in defendant's favor where plaintiff asserted alcoholism discrimination claim but drank on the job); *Maddox v. Univ. of Tenn.*, 62 F.3d 843, 845 (6th Cir. 1995) (affirming summary judgment in defendant's favor where plaintiff asserted alcoholism discrimination claim but repeatedly drove under the influence),

15

*abrogated on other grounds by Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312 (6th Cir. 2012). As the *Maddox* court pointed out, the ADA itself expressly "contemplate[s] distinguishing the issue of misconduct from one's status as an alcoholic." 62 F.3d at 848 (citing 42 U.S.C.A. § 12114(c)(4)). *Maddox* further explained that "it strains logic" to conclude that alcoholism shields certain inappropriate conduct because "while alcoholism might compel [plaintiff] to drink, it did not compel him to operate a motor vehicle or engage in the other inappropriate conduct reported." *Id*.; *see also Mararri v. WCI Steel, Inc*., 130 F.3d 1180, 1182 (6th Cir. 1997) ("[W]hile the ADA 'protects an individual's status as an alcoholic,' merely being an alcoholic does not insulate one from the consequences of one's actions.") (quoting *Flynn v. Raytheon*, 868 F. Supp. 383, 387 (D. Mass. 1994)). In this case, plaintiff's alcoholism "does not insulate" him, *Mararri*, 130 F.3d at 1182, from the consequences of his workplace misconduct during the summer of 2021 [*see* Doc. 41, pp. 113–14].

Plaintiff's suspicious timing arguments do not rebut this clear legal standard: inappropriate conduct is not rendered a pretextual basis for termination merely because it flowed from an employee's alcoholism. *See Stanciel*, 570 F. App'x at 582. Here, defendant understandably scrutinized whether plaintiff could continue to meet the mental and physical demands placed upon firefighters, which plaintiff has described in his own testimony regarding the emotional consequences that flowed from his service in the line of duty [*see, e.g.*, Doc. 37, pp. 150–51]. While the texts between Shelton and Herndon evidence frustration with plaintiff's actions prior to disclosure of his alcoholism, they do not

16

constitute sufficient evidence from which the finder of fact could infer discriminatory intent regarding plaintiff's as-of-yet disclosed alcoholism [*see* Doc. 38, p. 160]. If anything, the timing of these texts undermines plaintiff's position because they show the difficulty his misconduct caused for co-workers who, at that time, had no knowledge of his disabilities. And plaintiff does not dispute that he engaged in misconduct that led to Shelton's recommendation that he be terminated; accordingly, there is no dispute of material fact as to NFD's legitimate non-discriminatory basis for plaintiff's termination. Having already conceded the first method for rebutting defendant's justification under *Kocsis*, plaintiff has not presented evidence to create a dispute of fact as to whether defendant's "proffered reasons did not actually motivate the action; or [] that they were insufficient to motivate the action." 97 F.3d at 883.

Because plaintiff fails to demonstrate, by a preponderance of the evidence, that defendant's proffered reason for his termination was a pretext for discrimination on the basis of his alcoholism and PTSD, summary judgment should be granted to defendant. *See Hedrick v. W. Rsrv. Care Sys.*, 355 F.3d 444, 462 (6th Cir. 2004). On this question, defendant has "shown[n] that there is no genuine dispute as to any material fact and . . . is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(d). Accordingly, defendant's motion for summary judgment [Doc. 31] is **GRANTED** with respect to the ADA discrimination claim.

17

### b. Failure to Accommodate under the ADA

Plaintiff next argues that an employer can violate the ADA's accommodation requirement even after termination if the employer terminates the employee for an unlawful reason [Doc. 51, p. 25]. Here, plaintiff incorporates his prior ADA argument regarding defendant's allegedly pretextual motivation to assert that he was not terminated for legal cause [*Id.*]. Additionally, plaintiff asserts that defendant failed to engage in the interactive process required under the ADA by not considering and ultimately granting his sought one-year leave for rehabilitative treatment [*Id.* at 26].

Defendant argues that plaintiff's failure to accommodate claim does not stem from a specific request by plaintiff for a reasonable accommodation [Doc. 48, p. 20]. Moreover, even if plaintiff's September 21, 2021, request for leave is construed as his accommodation request, he made this request after he had engaged in conduct that led to his termination [*Id.* at 21]. In defendant's view, the timing of this request is dispositive because an employer is not obligated to provide reasonable accommodations under the ADA that arise after an employee has committed terminable conduct [*Id.*].

"To establish a prima facie claim for failure to accommodate, 'a plaintiff must show that (1) she was disabled within the meaning of [the statute], (2) she was otherwise qualified for her position, with or without reasonable accommodation; (3) the defendant knew or had reason to know about her disability; (4) she requested an accommodation; and (5) the defendant failed to provide the necessary accommodation.'" *King v. Steward Trumbull Mem'l Hosp., Inc.*, 30 F.4th 551, 560 (6th Cir. 2022) (quoting *Kirilenko-Ison v. Bd. of Edu.*

18

*of Danville Indep. Schs.*, 974 F.3d 652, 669 (6th Cir. 2020)). Additionally, "[t]he timing of a request is crucial, as 'an employer does not have to rescind discipline (including termination) warranted by misconduct.'" *Yarberry*, 625 F. App'x at 742 (quoting E.E.O.C. Guidance, 2008 WL 4786697, at *1).

As an initial matter, the Court has already determined that there is no genuine dispute as to whether defendant's cited non-discriminatory basis to recommend plaintiff's termination was pretextual (*see supra* Section III(a)(3)); therefore, this determination would foreclose his arguments regarding pretextual termination in the accommodation context, as well. Here, plaintiff requested leave on September 14, 2021, *after* both instances of his terminable misconduct occurred [Doc. 37, pp. 191–92; Doc. 40, pp. 182, 188–89]. As the Sixth Circuit emphasized in *Yarberry*, "timing of a request is crucial" because "[h]ad [plaintiff] not already engaged in misconduct meriting termination, it is possible that his requests for time off due to his hospitalization might have been timely and [defendant] would have been obliged to try to accommodate him." 625 F. App'x at 742. Because defendant's legitimate basis for plaintiff's termination arose concurrently with his request for accommodation, defendant was not obligated to engage in the interactive process for an employee who was not "otherwise qualified for [his] position, with or without reasonable accommodation." *King*, 30 F.4th at 560.

There is no genuine dispute of fact on the record regarding the timing of this request or the nature of plaintiff's misconduct. Accordingly, defendant's motion for summary judgment [Doc. 31] is **GRANTED** with respect to the ADA failure to accommodate claim.

19

### c. Discrimination under the Rehabilitation Act of 1973

Plaintiff's discrimination claim under the Rehabilitation Act of 1973 is, by his own admission, highly similar to his ADA claim [Doc. 51, p. 27]. Given that the Court has already **GRANTED** defendant's motion for summary judgment with respect to both of his ADA claims and the Rehabilitation Act is "quite similar in purpose and scope" to the ADA, *see Tri-Cities Holdings LLC v. Tennessee Admin. Procs. Div.*, 726 F. App'x 298, 307 (6th Cir. 2018), defendant's motion for summary judgment [Doc. 31] is **GRANTED** with respect to plaintiff's Rehabilitation Act on the same grounds (*see supra* Sections III(a)–(b)).

### d. Interference and Retaliation under the Family and Medical Leave Act

Plaintiff contends that defendant unlawfully interfered with his FMLA leave [Doc. 36, pp. 12–21].[6] His argument unfolds in two steps. First, as in the ADA context, he asserts that defendant constructively discharged him despite his voluntary resignation [*Id.* at 13–14]. Plaintiff must establish constructive discharge as a threshold matter because defendant is ordinarily not required to provide FMLA leave to an employee who voluntarily resigns. *See Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 447 (6th Cir. 1999). Second, plaintiff argues that defendant interfered with his rights under FMLA by refusing his request for leave and, instead, terminating his employment [*Id.* at 14–16]. He also alleges FMLA retaliation following his approval and use of leave to seek inpatient rehabilitative treatment beginning on June 11, 2021 [Doc. 51, pp. 27–28].

---

[6] As defendant points out, plaintiff captioned Count Four of his complaint with "FMLA Discrimination" as opposed to interference [Doc. 1, p. 15]. However, plaintiff describes his FMLA claim as one for interference throughout his memorandum in support of his motion for partial summary judgment [*see* Doc. 36]. The Court analyzes both theories.

20

Defendant argues that plaintiff would not have been able to return to work at the conclusion of his available FMLA leave, which excused its legal obligation to provide him with leave [Doc. 47, p. 4]. Because plaintiff had already taken FMLA leave in June 2021 to seek inpatient rehabilitation, he was eligible for only three additional weeks' leave as of September 2021 [*Id*. at 5]. And since plaintiff sought three to 12 months of leave for further treatment, defendant argues that plaintiff conceded his inability to return to work following the available FMLA leave period [*Id.* at 5–6]. Alternatively, defendant argues that plaintiff was not entitled to *any* FMLA leave as of September 14, 2021, because he had engaged in terminable conduct on September 12 [*Id.* at 10].

Under the FMLA, qualified employees are entitled to "up to twelve weeks of unpaid leave each year if, among other things, an employee has a 'serious health condition that makes the employee unable to perform the functions of the position of such employee.'" *Walton v. Ford Motor Co*., 424 F.3d 481, 485 (6th Cir. 2005) (quoting 29 U.S.C. § 2612(a)(1)(D)). If the employee returns to work within that period, he or she is entitled to be reinstated to his or her original position or placed in "an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." *Id*. § 2614(a)(1). Covered employers are prohibited "from interfering with, restraining, or denying the exercise of their employees' rights under the statute[.]" *Edgar v. JAC Prods., Inc*., 443 F.3d 501, 507 (6th Cir. 2006). Employers are also prohibited from discharging or discriminating "against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. §§ 2615(a)(1), (a)(2), (b).

21

"To make a prima facie case of FMLA retaliation, a plaintiff must show that he engaged in FMLA-protected activity, the employer knew that he was exercising his FMLA rights, the employer subsequently took an adverse employment action against him, and there was a causal connection between the protected activity and adverse action." *Robinson v. Compass Grp. USA, Inc.*, No. 22-1819, 2023 WL 8613501, at *2 (6th Cir. Aug. 16, 2023), *cert. denied*, 144 S. Ct. 703 (2024), *reh'g denied*, 144 S. Ct. 2556 (2024). An interference claim, by contrast, requires a plaintiff to "prove that: (1) she was an eligible employee, (2) the defendant was an employer as defined under the FMLA, (3) she was entitled to leave under the FMLA, (4) she gave the employer notice of her intention to take leave, and (5) the employer denied the employee FMLA benefits to which she was entitled." *Ward v. Sevier Cnty. Gov't*, 440 F. Supp. 3d 899, 915 (E.D. Tenn. 2020) (quoting *id*.). Under the interference theory, "[t]he issue is simply whether the employer provided its employee the entitlements set forth in the FMLA." *Edgar*, 443 F.3d at 507 (quoting *Arban v. West Pub. Co.*, 345 F.3d 390, 400–01 (6th Cir. 2003)).

Neither of plaintiff's FMLA theories survive summary judgment. Assuming without deciding that plaintiff could prove that he was constructively discharged (*see supra* Section III(a)(1)), plaintiff's FMLA interference claim fails for the same reason as his ADA accommodation claim: the leave at issue was requested on September 14, 2021, after his terminable conduct. Therefore, defendant was not obligated to provide leave to an employee who was no longer deemed eligible for his position. *See Ward*, 440 F. Supp. 3d at 915. As for FMLA retaliation, the *McDonnell Douglas* burden-shifting framework

analyzed in connection with plaintiff's ADA claims applies equally here in the FMLA context based on indirect evidence. *See Marshall*, 854 F.3d at 379. As a consequence, the Court's discussion of defendant's legitimate non-discriminatory basis and plaintiff's failure to show a disputed pretextual motivation (*see supra* Sections III(a)(2)–(3)) applies equally to this claim. While the parties dispute whether Masoner and Shelton discussed plaintiff's eligibility for leave during their meeting on September 14, 2021, this dispute is immaterial because "temporal proximity is not enough to demonstrate that an employer's proffered reason was a pretext for discrimination." *Ritenour v. Tennessee Dep't of Hum. Servs.*, 497 F. App'x 521, 534–35 (6th Cir. 2012) (citing *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 285 (6th Cir. 2012)). In other words, even if the Court infers, as plaintiff prefers, that the timing of Shelton's presentation to plaintiff of a termination letter four days after disclosing his relapse and two days after requesting additional leave is "suspicious," this inference standing alone does not satisfy the burden to rebut defendant's stated reason for plaintiff's termination [*see* Doc. 36, p. 19].

In sum, defendant has "show[n] that there is no genuine dispute as to any material fact" regarding both of plaintiff's FMLA claims "and . . . is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(d). Accordingly, defendant's motion for summary judgment [Doc. 31] is **GRANTED** with respect to the FMLA claims. Conversely, plaintiff's motion for partial summary judgment as to these claims [Doc. 34] is **DENIED**.

23

### e. Implied Right of Action under the Tennessee Public Safety Behavioral Health Act

Plaintiff acknowledges that the Tennessee Public Safety Behavioral Health Act ("TPSBH"), Tenn. Code Ann. § 8-50-119, does not expressly provide for a private right of action but argues that the Court should imply a right of action based on the factors set forth in *Affordable Constr. Servs., Inc. v. Auto-Owners Ins*. Co., 621 S.W.3d 693, 696 (Tenn. 2021) [Doc. 51, p. 29]. He contends that if the TPSBH does not impliedly contain a right of action, the statute "is essentially toothless" [*Id*.]. Additionally, if the Court finds a right of action exists, plaintiff contends that sovereign immunity does not extend to negligence cases in which a government employee "proximately caused" defendant's injury [*Id*. at 30 (citing Tenn. Code Ann. § 29-20-205)].

Defendant contends that the TPSBH does not contain a private right of action [Doc. 48, p. 26]. The statute's enforcement, for defendant, depends on action from the State of Tennessee or a suit for injunctive or declaratory relief [Doc. 53, p. 19]. Additionally, because defendant is a Tennessee municipality, it argues that sovereign immunity shields it from any potential liability under the TPSBH in the absence of an express waiver of immunity as to this type of claim [Doc. 48, pp. 26–27]. Alternatively, defendant argues that even if such a private right of action exists, plaintiff's failure to disclose his PTSD diagnosis to defendant's employees deprived NFD of an opportunity to comply with the TPBSH [*Id*. at 28]. Defendant responds to plaintiff's final argument by noting that the word "negligence" does not appear anywhere in the complaint [Doc. 53, p. 19].

24

The TPSBH provides that "[p]ublic safety employers shall not engage in the retaliatory treatment of public safety employees seeking or utilizing mental health service providers or behavioral health programs, including, but not limited to, discharge, denial of promotions, punitive work assignments, transfers, or other similar retaliatory actions." Tenn. Code Ann. § 8-50-119(d). The statute became effective on July 1, 2018, and the Court has not been made aware of any cases—either Tennessee or federal—that have yet addressed whether the statute provides for a private right of action. Therefore, when confronted with an issue of first impression arising from Tennessee law, the Court "look[s] to the final decisions of [Tennessee's] highest court, and if there is no decision directly on point, then we must make an *Erie* guess to determine how that court, if presented with the issue, would resolve it." *Innovation Ventures, LLC v. Custom Nutrition Lab'ys, LLC*, 912 F.3d 316, 334 (6th Cir. 2018) (quoting *Conlin v. Mortg. Elec. Registration Sys., Inc.*, 714 F.3d 355, 358–59 (6th Cir. 2013)). Put differently, "the court must predict how the Supreme Court of [Tennessee] would resolve the issue." *Liberty Mut. Ins. Co. v. Est. of Bobzien by & through Hart*, 377 F. Supp. 3d 723, 738 (W.D. Ky. 2019), *aff'd sub nom. Liberty Mut. Ins. Co. v. Est. of Bobzien*, 798 F. App'x 930 (6th Cir. 2020) (quoting *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 508 (6th Cir. 2003)).

The Tennessee Supreme Court has made clear that "[i]t is the exclusive province of the legislature—not the courts—to create a statutory private right of action." *Affordable Constr. Servs., Inc. v. Auto-Owners Ins. Co.*, 621 S.W.3d 693, 696 (Tenn. 2021) (citing *Brown v. Tenn. Title Loans, Inc.*, 328 S.W.3d 850, 855 (Tenn. 2010)) (citations omitted).

25

Tennessee courts locate the legislature's intent to create a right of action in one of two ways: "based on the express terms of a statute or by implication through the statute's structure and legislative history." *Id*.; 621 S.W.3d at 696. In this case, the parties agree that TPSBH does not expressly provide for a private right of action [*see* Docs. 48, 51]; so, the Court focuses on the Tennessee Supreme Court's methods for evaluating "structure and legislative history," which include: "(1) whether the party bringing the cause of action is an intended beneficiary within the protection of the statute, (2) whether there is any indication of legislative intent, express or implied, to create or deny the private right of action, and (3) whether implying such a remedy is consistent with the underlying purposes of the legislation." *Hardy v. Tournament Players Club at Southwind, Inc*., 513 S.W.3d 427, 435 (Tenn. 2017) (quoting *Brown*, 328 S.W.3d at 855–56).

Considering each of these three sources of legislative history, the Court is unpersuaded that the Tennessee General Assembly intended to create a private right of action within the TPSBH. Although plaintiff does appear to fall "within the protection of the statute," *Hardy*, 513 S.W.3d at 435, insofar as he was a "public safety employee[] seeking or utilizing mental health service providers or behavioral health programs," Tenn. Code Ann. § 8-50-119(d), only this first prong points in his favor.

There is no indication of legislative intent to create a private right of action. The statutory text does not contain any reference to enforcement, whether by private civil suits or otherwise. Structurally, the TPSBH appears within the "Miscellaneous Provisions" chapter of the Tennessee Code's Title 8, which covers topics ranging from foster parent

26

training to unpaid leaves of absences. The breadth of issues addressed in sections 8-50-101 to 8-50-120 further undercuts plaintiff's argument because the TPSBH appears alongside a variety of state employment policy provisions rather than enforcement provisions. As for other sources of legislative history, the Tennessee General Assembly did not discuss a private right of action or any means of the bill's enforcement during any of its hearings before the Tennessee House, Senate, or Senate committees. *See Hearing on S.B. 1797 Before the S. Health & Welfare Comm.*, 2018 Leg., 110th Sess. (Tenn. Feb. 28, 2018); *Hearing on S.B. 1797 Before the S. Ways & Means Comm.*, 2018 Leg., 110th Sess. (Tenn. Apr. 2, 2018); *Hearing on S.B. 1797 Before the S.*, 2018 Leg., 110th Sess. (Tenn. Apr. 19, 2018); *Hearing on S.B. 1797 Before the H.*, 2018 Leg., 110th Sess. (Tenn. Apr. 24, 2018).

As for the "underlying purposes of the legislation," the Tennessee Supreme Court made clear in *Affordable Const. Servs.* that even if certain provisions "could have put more 'teeth' in" the statute, "that is not our call. It is the role of the legislature, not the courts, to create a statutory private right of action." 621 S.W.3d at 699. Applying the methods set forth in *Hardy*, 513 S.W.3d at 435, the Court will not imply a private right of action to the TPSBH in the absence of clear evidence that the legislature intended to create one. Because the Court does not imply a right of action to support this claim, it is unnecessary to reach the merits of plaintiff's TPSBH claim.

Accordingly, defendant's motion for summary judgment [Doc. 31] is **GRANTED** with respect to the remaining TPSBH claim.

27

## IV.   Conclusion

For the reasons above, the Court **GRANTS** defendant's motion for summary judgment [Doc. 31], **DENIES** plaintiff's motion for partial summary judgment [Doc. 34], and this case will be **DISMISSED**.  An appropriate order shall enter.

IT IS SO ORDERED.

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE